IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

PAUL BERGERSEN,

               Plaintiff,

        vs.                              Case No. 05-1044-JTM

SHELTER MUTUAL INSURANCE
COMPANY, SHELTER GENERAL
INSURANCE COMPANY and SHELTER
LIFE INSURANCE COMPANY,

               Defendants.

## MEMORANDUM AND ORDER

     This matter comes before the court on the defendants' Motion for Summary Judgment
(Dkt. No. 64). Defendants argue that: 1) plaintiff fails to establish a prima facie case of
retaliatory discharge in violation of Kansas public policy; and 2) plaintiff's employment was
terminated for legitimate reasons related to performance concerns that were not pretextual.
Plaintiff responds that he has made a prima facie case of retaliatory discharge and he can show
both causation and motive. After reviewing the parties' arguments, the court finds in favor of
defendants.

## I. STANDARD OR REVIEW

     Summary judgment is proper where the pleadings, depositions, answers to
interrogatories, and admissions on file, together with the affidavits, if any, show there is no
genuine issue as to any material fact, and that the moving party is entitled to judgments as a

matter of law.  Fed.R.Civ.P. 56(c).  In considering a motion for summary judgment, the court must examine all of the evidence in a light most favorable to the opposing party.  <u>Jurasek v. Utah State Hosp.,</u> 158 F.3d 506, 510 (10th Cir. 1998).   The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt.  <u>Baker v. Board of Regents</u>, 991 F.2d 628, 630 (10th Cir. 1993).  The moving party need not disprove the nonmoving party's claim or defense; it need only establish that the factual allegations have no legal significance.  <u>Dayton Hudson Corp. v. Macerich Real Estate Co.,</u> 812 F.2d 1319, 1323 (10th Cir. 1987).

The party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts.  "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a <u>genuine issue for trial</u>.'" <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,</u> 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis in <u>Matsushita</u>).  The opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the opposing party must present significant admissible probative evidence supporting that party's allegations.  <u>Anderson v. Liberty Lobby, Inc.,</u> 477 U.S. 242, 256 (1986).

## II. FINDINGS OF FACT

### A. Shelter and Its Employees

The Shelter family of companies is comprised of Shelter General Insurance Company, Shelter Mutual Insurance Company, Shelter Life Insurance Company, and Shelter Reinsurance Company.

Plaintiff worked for Shelter as a salaried sales agent in Garden City, Kansas, from May 25, 1999, until July 1, 2003.  Plaintiff understood his employment was at-will.  Plaintiff reported

2

regularly to both a District Manager and a State Sales Manager.  Plaintiff reported to District

Manager Mark Hestand throughout plaintiff's employment.  Plaintiff reported to State Sales

Manager Jay Martin from the beginning of plaintiff's employment until July 2002, when Martin

transferred to another position with Shelter in Missouri.  Plaintiff then reported to State Sales

Manager Jason Gossard from July 2002 until the termination of plaintiff's employment on July 1,

2003.

Sheryl Oncken is a Senior Underwriter in Personal Lines Underwriting, and was the home

office underwriting contact with whom plaintiff principally worked.  Connie Weable, another

Senior Underwriter, occasionally worked with plaintiff as his home office underwriting contact.

Maria Bolen is a Spanish-speaking woman of Hispanic origin who worked for plaintiff as

a secretary in 2002 and 2003.

## B. Plaintiff's Training and Contract

Plaintiff took part in a week-long Fundamentals of Personal Insurance home office

training course at the beginning of his employment.  Plaintiff was instructed as to Shelter's

expectations of him as a salaried insurance sales agent.  Plaintiff understood that Shelter

expected him to operate and maintain a profitable agency.  Plaintiff understood he was to comply

with each of the provisions of the Shelter Insurance Agent's Manual.  Plaintiff's responsibilities

included the sale of home, auto, life, and various other insurance products to qualified applicants.

Plaintiff's responsibilities also included the fulfillment of various administrative obligations,

including maintaining a premium trust fund account, policy and customer files, and the agency

accounting system.  Plaintiff understood that Shelter expected him to follow all of the

underwriting rules and underwriters' suggestions.

As a salaried sales agent, plaintiff earned a salary and had the opportunity to earn commissions on new business according to the salaried agent commissions schedule as well as a life sales bonus. A portion of plaintiff's business expense also was also reimbursed.

In contrast to salaried sales agents, independent agents earned no salary, but had the potential for earning greater total compensation (relative to salaried agents) through commissions and bonuses.  Salaried sales agents were typically considered for transition to independent agents based on a number of factors including agency administration, growth, life sales, and production – the point at which a salaried agent's renewal commissions would exceed the total of his or her monthly salary and reimbursed business expenses.  A salaried sales agent had to receive the recommendation of both his/her District Manager and his/her State Sales Manager in order to receive an offer for an independent agent position.

Transition from a salaried sales agent position to an independent agent position may take anywhere from four, five, or six years, depending on the individual agent and his or her motivation.  Plaintiff understood Shelter's expectations regarding the potential transition from a salaried sales agent position to an independent agent position.  Plaintiff's performance as a salaried sales agent was evaluated according to standard Shelter protocol using Agency Performance Appraisals, Agency Administrative Reviews, Quarterly Validation Review Reports, and regular informal assessments by his District Sales Manager.  Agency Performance Appraisals for plaintiff were completed on February 17, 2000; October 11, 2000; February 8, 2001; and November 14, 2001.  Each reflected agency administration and operational problems.

Plaintiff and other Shelter agents were required to submit complete and accurate applications on behalf of potential insureds.

4

Plaintiff understood that it was important to submit applications completely and accurately, though it became difficult for him to submit complete applications due to the substantial increase in his business.  Plaintiff explained the full meaning of an application before having a potential insured sign it.

## C. Plaintiff's Performance

The number of incomplete auto insurance applications, life insurance applications and home insurance applications plaintiff submitted increased dramatically in 2002 and continued at an unacceptable level until plaintiff's employment termination on July 1, 2003.  Plaintiff was counseled frequently about the number of mistakes that were being made on the applications he submitted.

An agency's loss ratio is calculated as the amount of premiums collected in a given year taken as a percentage of the annual losses of the agency.  Maintaining low loss ratios is critically important to an agent's success.  Plaintiff admitted that in 2002, his loss ratio "[l]ooked good in the beginning and then it went south."  Plaintiff's supervisors expressed concern to plaintiff about his high loss ratios.

Shelter expects agents to complete premium trust fund account journals on a daily basis.  Plaintiff did not keep his premium trust fund account balanced and up to date.  Plaintiff admits that he stopped performing regular audits on his premium trust fund account "sometime in 2002" because Shelter's computers began balancing all premiums each night.

Quarterly Validation Review Reports were completed in June 2000, April 2001, July 2001, January 2002, April 2002, July 2002, October 2002, and January 2003. Each reflected plaintiff's failure to meet minimum production goals.  Meeting minimum production levels is

5

referred to as "validation."  Plaintiff understood that maintaining a good Insurance Protection Review (hereafter "IPR") Program for potential applicants could insure validation.  Plaintiff understood he was supposed to complete IPR Forms as a salaried sales agent. Plaintiff never completed IPR Forms.  Plaintiff understood that he could be put on a business improvement plan and may be put on probation if he did not meet production expectations.

Plaintiff was placed on improvement plans related to poor production in October 2000 and August 2001, and on a plan to improve production and for administrative issues in April 2003 .  Plaintiff did not meet the production goals that were set for him, nor did he meet the goals that he set for himself.  Plaintiff understood that his employment may be terminated if he failed to meet production expectations.  Plaintiff acknowledges that his communication with underwriting staff was important.  Plaintiff described his relationship with Senior Underwriter Sheryl Oncken as "poor."

In 2002 and 2003, Mark Hestand and Jason Gossard counseled plaintiff regarding plaintiff's improper and insufficient communications with home office underwriting staff. Plaintiff frequently failed to reply to e-mails from underwriting staff.  Plaintiff's failure to reply to e-mails from underwriting staff became more pronounced in 2002 and 2003.  Plaintiff acknowledges that, because he failed to respond to e-mails from underwriting staff, some of his insured's policies were canceled.

Senior Underwriter Sheryl Oncken discussed with plaintiff the reasons for the cancellation or non-renewal of plaintiff's insured's policies.  Plaintiff believes Sheryl Oncken made appropriate underwriting decisions.  Plaintiff believes Sheryl Oncken followed the underwriting guidelines.  Plaintiff can identify no underwriting rules he believes Connie Weable

failed to follow.

Field underwriting is a task that an agent undertakes when he or she evaluates the risk of a potential applicant before submitting an application on his or her behalf to the home office underwriting staff.  Plaintiff acknowledges that field underwriting was a concern for his agency. On January 26, 2002, plaintiff authored an e-mail to Mark Hestand in which he informed Hestand that "[i]f I want other people to do there [sic] job better, than [sic] I need to do mine better as well."  He added that "I need to run this office very intelligently starting today."

On March 21, 2002, plaintiff's underwriting contact, Sheryl Oncken, authored an e-mail to her supervisor, Jon Himmelberg, in which she sought "help (once again) with agent, Paul Bergersen."  Oncken went on to detail her concerns, reporting to her supervisor that "I am at a point where I don't know what else I can do. I feel it is totally unfair to the other 33-34 agents I work with because of the amount of time I spend almost everyday reading and trying to respond to his [e-mails]." She finished her e-mail by noting that "I am just about at my wit's end. I would appreciate any help you can provide."

Jon Himmelberg forwarded Oncken's e-mail to District Sales Manager Mark Hestand, adding:

> [Sheryl Oncken] tries to be very helpful, supporting and patient with her agents, but it seems Paul [Bergersen] has not gotten on board and is forcing her hand. What she says about her other 33-34 agents is probably most important. She really wants to help them but Paul is taking up so much of her time she isn't able to give the level of service she wants to. What is perhaps most aggravating is the fact many of his challenges are easily correctable and have been covered over and over with him.
>
> I know you have been working with Paul on many of these situations and we really appreciate it. I just wanted to weigh in for Sheryl to reiterate how tough things are dealing with Paul.

(March 21, 2002, e-mail from Himmelberg to Hestand).  By e-mail reply on March 21, 2002,

Mark Hestand concurred with the assessment of the state of plaintiff's agency:

> I know both of you have just about reach [sic] your wits end with Mr. Bergersen with his
> incomplete applications and [e-mails]. I have visited with him on this for the last several
> months and I am running out of things to say.  He likes to blame everything on someone
> else. Is there any thing that Jon or the underwriting department can send out or what
> actions do we have available to help with the situation.
>
> Would hate to pull his binding authority but is there anything from that end? I hope you
> understand what I am trying to get at. Maybe a letter or e-mail detailing improvement or
> !!!!!!.

(Mar. 21, 2002, e-mail from Hestand to Himmelberg and Oncken).  On May 17, 2002, Mark

Hestand sent an e-mail to State Sales Manager, Jay Martin. In his e-mail, he detailed the ongoing

concerns with plaintiff's communications with underwriting staff:

> I know you have gotten a couple of [e-mails] from Sheryl in regards to Paul.  Over the
> last 3 or 4 months, at least, I have been on Paul to double check all applications before
> they mail them and to make sure all [e-mails] to the home office are clear as to what his
> agency is asking.
>
> But it just isn't working and his attitude towards the underwriting department is just BAD
> and I know Sheryl is about at her wits end.
>
> Got any suggestions on where to go with him? Any ideas will be appreciated so I can visit
> with him again.

(May 17, 2002, e-mail from Hestand to Martin).  On May 23, 2002, State Sales Manager, Jay

Martin, instructed plaintiff to copy Hestand and him on all correspondence with underwriting

involving incomplete applications. Martin added:

> As I have stated to you earlier, I am very proud of your production numbers, but I am as
> much concerned that the apps be done properly with good underwriting. When an app is
> incomplete, it is evidence that the underwriting process is not being done as thoroughly as
> it should be. It is also a big waste of time and money for you to have to do everything a
> second time. It is also a big waste of company time and money to write you for the
> additional information.

(May 23, 2002, e-mail from Martin to Plaintiff). Plaintiff stated he had not received the [e-mail] and that if he received it, he "didn't pay any attention to [Martin's May 23, 2002, e-mail]."

Plaintiff was placed on an agency plan of improvement on September 17, 2002, for a host of agency administration and operational concerns. In the agency plan of improvement, District Manager Mark Hestand identified plaintiff's problems related to applications, claims, communication with the home office, life applications, and maintenance of plaintiff's premium trust account. In the plan of improvement, Hestand told plaintiff that "[i]t might take an extra minute or two per application or it might take an extra few hours a week to make sure the job is done correctly the first time. In the long run, if you address these items of concern and make the needed corrections within your agency, it will save work by not having to do the work a second time," Hestand concluded the plan of improvement with a stern warning: "[t]he items listed above need your immediate attention. As we have talked about in the past, there is a lot more to running a Shelter Insurance office than just selling insurance. Your office is a small business and as a small business these mistakes just cannot be allowed to continue." (Sept. 17, 2002, Agency Plan of Improvement).

Plaintiff acknowledges that he did not disagree with any of the concerns identified in the September 17, 2002, Agency Plan of Improvement.  Plaintiff acknowledges that Mark Hestand had conversations with plaintiff on each of these subjects prior to September 17, 2002.

On September 20, 2002, Jason Gossard sent plaintiff an e-mail in which he summarized a conversation between him and plaintiff that same day regarding the continuing concerns with his agency:

Per our conversation today, please be advised of the following and take immediate action

to correct these.

> I have been advised that both Mark Hestand, your DSM, and Jay Martin, your former SSM, have discussed areas of concern with you in the past. I have been advised that Mark has visited you again recently to discuss several issues of your agency that are being directed to Mark and myself from both the Underwriting department and the Claims department. It was also noted in your recent agency appraisal that there are some issues that need to be corrected. You have informed me that action has been taken to correct most of these issues and you are working on devising a plan to take action on those other items that are still drawing attention to your agency.

(Sept. 20, 2002, e-mail from Gossard to Plaintiff).  After advising plaintiff of the seriousness of the concerns with plaintiff's still-deteriorating relationship with underwriting staff, Gossard instructed plaintiff to copy him on any future correspondence with underwriting staff.  Gossard noted in closing that "Mark [Hestand] and I are willing to work with you in any way we can to help you get these agency issues corrected. It is important that you take whatever action necessary to get this corrected." (Sept. 20, 2002, e-mail from Gossard to Plaintiff).

Plaintiff described his agency in October 2002 as "out of control."

On October 25, 2002, Mark Hestand sent an e-mail to plaintiff in which he again identified areas of concern requiring plaintiff's attention. In particular, Hestand noted problems related to application cancellation due to inaccurate or incomplete information, inappropriate communications with the home office, and improper maintenance of the agency premium trust fund account.  As before, plaintiff was instructed to "continue to monitor your office operations each day and concentrate on the areas listed above. As your sales manager I am here to help you any way possible to succeed in your agency. We will monitor these items of concern again in 30 days to see if additional improvement has been made in each area."

Plaintiff acknowledges that he did not disagree with any of the concerns identified in the

e-mail he received from Mark Hestand on October 25, 2002.

On November 26, 2002, Gossard sent plaintiff yet another e-mail detailing concerns

regarding communication with underwriting:

> As we discussed in your visit last week. Correspondences between you and underwriting have improved but still are a serious concern.
>
> If you receive a notice or request from Underwriting these need to be handled immediately. There should be very few, if any, instances where we cancel a policy because their request for additional information was not met. Attached below is a copy of one of these sent to you today. This is the second one of these I've received involving you today. Your immediate attention is required on these correspondences from underwriting.

(Nov. 26, 2002, e-mail from Gossard to Plaintiff).

Plaintiff acknowledges that he did not disagree with any of the concerns identified in the

e-mail he received from Jason Gossard on November 26, 2002.  On December 27, 2002, Sheryl

Oncken sent an e-mail to Mark Hestand and Jason Gossard informing them that "we continue to

receive insured's checks, premium trust checks, refund checks, etc. on policies with no

paperwork attached.  Sometimes they have a policy number on them and sometimes not. . . . I

wanted to make sure you are aware we are still having problems in these areas among many

others. Any help you can provide would be greatly appreciated." (Dec. 27, 2002, e-mail from

Oncken to Hestand and Gossard).

**D. Performance Issues in 2003**

In 2003, plaintiff felt he was in jeopardy of losing his insurance license because he was

submitting incomplete homeowner's insurance applications.  On February 17, 2003, Mark

Hestand wrote plaintiff an e-mail saying "[a]s we talked about last week. Keep striving in your

agency to turn things around." Hestand went on to counsel plaintiff on the need for plaintiff to

focus on profitability, communication with underwriting staff, and attention to detail. (Feb. 17, 2003, e-mail from Hestand to Plaintiff).

Plaintiff acknowledges that he spoke with Mark Hestand about the concerns identified in the e-mail plaintiff received from Mark Hestand on February 17, 2003.

On February 25, 2003, after plaintiff expressed an interest in becoming an independent agent, State Sales Manager, Jason Gossard, informed plaintiff that plaintiff would not be considered for any such position because "[a]s we've discussed many times, improvement in your overall agency operations is still needed." Gossard noted that plaintiff's agency continued to demonstrate serious performance deficiencies related to profitability, incomplete and inaccurate applications, ineffective communication to underwriting and other departments, and untimely replies to correspondence. (Mar. 5, 2003, e-mail and letter from Gossard to Plaintiff).  Plaintiff acknowledges that he was still having problems in the areas identified in the letter plaintiff received from Jason Gossard on March 5, 2003.

On April 15, 2003, Jason Gossard sent an e-mail to plaintiff advising that "I still continue to receive too many correspondences from underwriting on incomplete information, undisclosed information, etc." Gossard added:

> You [sic] loss ratio continues to be the biggest concern. Through March, your agency's loss ratio was 138.12%. Your loss ratio history is broken down below.
>
> | 2003 | 138.12% |
> |------|---------|
> | 2002 | 85.45% |
> | 2001 | 118.28% |
> | 2000 | 93.64% |
> | 1999 | 94.64% |
> | 3-Yr | 101.70% |
>
> As we've discussed, these numbers are well above the break-even mark of 62% and need your continued focus and attention to improve. In contrast to your loss ratio through March 2003:

| | |
|---|---|
| Region 1 | 52.99% |
| Region 2 | 51.58% |
| Company | 52.00% approximate |
| Kansas | 47.21% |
| KS Dist 5 | 46.39% |

As you can see, your agency's loss ratio is not trending with your district's loss ratio nor the State's, Region's or Company's loss ratio.  <u>Please make a concerted effort to underwrite your new and existing business as careful as possible in an attempt to correct your loss ratio as soon as possible</u>.

(Apr. 15, 2003, e-mail from Gossard to Plaintiff) (emphasis added).  Plaintiff acknowledges that his three-year adjusted loss ratio was not trending with the loss ratios in the district, state, region or company.

Plaintiff was placed on a three-month Shelter Select Business Improvement Plan by Mark Hestand in mid or late April 2003.  The plan established monthly production requirements in each of three areas as well as administrative issue requirements. Hestand told plaintiff that "[t]his is a serious matter that requires your immediate and continued attention."

Plaintiff understood that he was obligated to improve his production in the identified areas to the required levels.  Plaintiff failed to meet any of the goals identified in the improvement plan.

On April 28, 2003, Mark Hestand sent an e-mail to plaintiff instructing him to copy Jason Gossard and him on every e-mail exchange with underwriting staff because "I continue to receive copies of e-mails stating that a policy is being set up for cancellation due to a lack of response from you, the agent." Hestand added "[a]s we have discussed this is a serious concern within your agency that needs to be addressed." Finally, Hestand added:

[i]t has been my hope that this type of action would not be necessary but I do not feel you have been able to correct this problem on your own. It is my hope that you will demonstrate the ability to complete applications correctly and handle correspondences

13

correctly and in a timely manner so this program will not be necessary and can be discontinued.

(Apr. 28, 2003, e-mail from Hestand to Plaintiff).

On April 30, 2003, plaintiff attempted to send a lengthy, disparaging and inflammatory e-mail to all Shelter Agents and Shelter CEO Don Duello. The e-mail reached only a few recipients before its delivery was blocked.  (Apr. 30, 2003, e-mail from Plaintiff).

On May 2, 2003, plaintiff met with Bob Cox, Regional Director of Sales, and Jim Tuley, in-house counsel. They advised plaintiff that his attempt to send the company-wide e-mail was unacceptable and (again) expressed concern regarding plaintiff's failure to resolve his long-standing agency administration and operational issues.  Bob Cox summarized the meeting in a memorandum to the file on May 5, 2003, in which he noted:

> Agent Bergersen did not disagree when I described the series of problems we were experiencing in his agency. These included missing correspondence, incomplete applications, missing pictures and significant overall difficulties communicating with Paul. He agreed that this was an extended pattern that had occurred over the last 14 months and that he was committed to fixing those problems regardless of his future with the company.

(May 5, 2003, Bob Cox Meeting Memorandum).

At the meeting, plaintiff acknowledged that, at times over a fourteen month period, he had experienced problems with his agency.

On May 6, 2003, plaintiff sent an e-mail to Mr. Tuley in which he called Kansas State Sales Manager Jason Gossard "Jason Gizzard." He claims he did so as a joke.  On May 15, 2003, Jason Gossard authored yet another e-mail to plaintiff regarding communications with underwriting staff:

> Attached below are 16 [e-mails] I've received from you today. Only one of the sixteen

14

includes any comments from you that pertain to the questions that Underwriting asked you in the original e-mail.

As you are aware you were placed on an Agency Administration Improvement Program on April 28, 2003, by your DSM, Mark Hestand.  In Mark's e-mail to you on April 28, he explained the program in detail.  You were asked to copy Mark and myself in your reply to Underwriting.  A suspense folder is being kept by both Mark and myself on any correspondence sent to you which requires a reply.
. . .
Most concerning is that I am beginning to be copied on several cancellation notices which state that they are being set up to cancel due to a lack of underwriting information that was requested . . . . This program was implemented to help manage the lack of appropriate responses to Underwriting and I'm concerned why this has continued even after being placed on this Improvement Program.

(May 15, 2003, e-mail from Gossard to Plaintiff).

Plaintiff acknowledges that when he received the e-mail from Jason Gossard on May 15, 2003, policies continued to be cancelled because plaintiff had not responded to e-mails from underwriting staff.

On May 22, 2003, Regional Director of Sales, Bob Cox, again contacted plaintiff to discuss plaintiff's significant problems with ineffective communication with underwriting staff. Cox scheduled a May 30, 2003 meeting with plaintiff in Garden City to discuss an opportunity for improvement.

**E. Probation**

Plaintiff was placed on a probation plan on May 30, 2003.  The Notice of Probation detailed the specific areas in which plaintiff was instructed to improve in the next 30 days.  In the Notice of Probation, State Sales Manager Jason Gossard identified plaintiff's continuing problems in the areas of agency administration/application workflow; premium trust account maintenance; communication with co-workers in the home office, claims office, sales

management, and with other agents; and life insurance production. Gossard advised plaintiff:

> Shelter expects you to take immediate and continued action to comply with the requirements of your probation.  You must also perform all other duties and responsibilities of a salaried agent in an acceptable and positive manner.  If your compliance with these requirements is determined to be unsatisfactory at any time during of after the probationary period, your employment with Shelter may be terminated.

(Notice of Probation).  Plaintiff understood the instructions to concentrate on the problems identified in the Notice of Probation or his employment may be terminated.  Plaintiff failed to correct the issues identified in the Notice of Probation.

Plaintiff's employment was terminated on July 1, 2003.  On February 25, 2003, during the conversation in which State Sales Manager, Jason Gossard, told plaintiff that he would not be offered an independent agent contract, plaintiff claimed that Shelter had engaged in discrimination against its Hispanic insureds.

Shortly after February 25, 2003, plaintiff informed District Sales Manager, Mark Hestand, that plaintiff had allegedly reported concerns regarding discrimination against Hispanic insureds to the Kansas Insurance Department (hereafter "KID") on November 6, 2002 and in January 2003.  Shelter had no knowledge of any reports allegedly made to the Kansas Insurance Commission until after the February 25, 2003 conversation with Jason Gossard.  Plaintiff also claims that, in January and February 2003, he made internal complaints of discrimination to District Sales Manager, Mark Hestand.

**F. Shelter's Internal Investigation**

In spring 2003, Shelter's in-house counsel, Jim Tuley, investigated plaintiff's allegations of discrimination.  During the course of the investigation, Tuley spoke with plaintiff on the phone on occasion and flew to Garden City, Kansas, on at least one occasion to personally meet with

plaintiff.  Tuley asked plaintiff for the names and other details regarding insureds against whom plaintiff believed Shelter had discriminated.  Plaintiff provided six names and family identification numbers to Tuley as evidence of the alleged discrimination against Hispanic insureds.  Plaintiff told Tuley that he believed the applications of some prospective Hispanic insureds had been denied and that the policies of some of his insureds had been canceled for reasons other than those allowed under Kansas insurance statutes.  Jim Tuley requested documentation supporting plaintiff's allegations of discrimination.

Plaintiff provided some of the requested documentation.

Jim Tuley investigated the circumstances surrounding each of the names and family identification numbers plaintiff provided to him.  His investigation confirmed that in each of the instances plaintiff identified, underwriting guidelines had been vigilantly applied without regard to any applicant's or insured's race or ethnicity.

In a letter dated May 22, 2003, Jim Tuley informed plaintiff that Shelter's investigation had found no evidence of discrimination.

**G. Tape Recording**

Plaintiff produced as part of this litigation a tape recording of a telephone conversation he had with Shelter Agent, Janice Aldag, regarding the transfer of an insured from his agency to hers. The transfer about which Paul Bergersen and Janice Aldag spoke was for Carmen Benitez and Victor M. Guevara, policy no. 15-1-4695526-2. The transfer took place on February 19, 2003.  In the tape-recorded conversation, plaintiff told Ms. Aldag that "[t]he only thing is, once the dialogue starts, they really can't touch me, because of the whistle blower law." In the same telephone conversation, plaintiff told Ms. Aldag "[ I just blow the whistle ... [they've got to sit

and put up with me until it's ... through." (Janice Aldag Aff. ¶¶ 9, 10).

## H. Plaintiff's Timeline of Events

In October 2001, plaintiff began writing extensive business for Hispanic clientele.  In the early summer, 2002, plaintiff began to perceive discrimination. He questioned defendants regarding the frequency of cancellations.  Defendants' State Sales Manager, Jason Gossard, called plaintiff and inquired as to why plaintiff had so many Hispanics in his book of business.

On August 22, 2002, defendants cancelled three auto policies of Enrique Garcia.

In September 2002, plaintiff contacted a lawyer friend in Chicago, Case Hoogendorn, to discuss the proper way to change defendants' policies and procedures without getting fired.

In October 2002, plaintiff referred Enrique Garcia to KID.  In November 2002, KID contacted plaintiff regarding Garcia's complaint.  On November 22, 2002, a representative of KID faxed to plaintiff copies of Kansas statutes that applied to his concerns as discussed in an earlier conversation.

In January 2003, plaintiff anonymously contacted John Campbell at KID regarding what he believed to be violations of state law by defendants.  Plaintiff continued to inquire of and complain to his superiors about his belief that defendants were profiling Hispanics.

On January 29, 2003, plaintiff contacted local lawyer, Douglas M. Crotty, for consultation regarding discrimination and the profiling of Hispanics by defendants.

On March 3, 2003, Mark Hestand went to plaintiff's office to give him an award for sales and plaintiff repeated his intention to proceed regarding defendants' discrimination.  On March 5, 2003, Jason Gossard sent a letter purportedly drafted on February 25, 2003 advising plaintiff that he would not be permitted to become a contract independent agent and that Gossard was going to

refer plaintiff's complaints to the Legal Department.  On March 21, 2003, plaintiff contacted

John Campbell with KID and advised him that things were improving.

    In April 2003, plaintiff became overwhelmed with cancellations and e-mail requirements

from underwriting and from managers.

    On May 8, 2003, plaintiff contacted John Campbell of KID and advised that his efforts

had not worked and requested a KID investigation. They both arranged to meet in Garden City to

review documents. Plaintiff then informed his managers that he has formally reported to KID.

## III. ANALYSIS

    The central issue is whether plaintiff has made a prima facie case to proceed with his

claim of retaliatory discharge.  Defendants argue that plaintiff did not make his claim in good

faith and he cannot establish the causation element of a retaliatory discharge claim.

    "Kansas follows the common-law employment-at-will doctrine, which allows employers

to terminate employees for good cause, for no cause, or even for the wrong cause."  Goodman v.

Wesley Medical Center, L.L.C. 276 Kan. 586, 589, 78 P.3d 817, 821 (Kan. 2003).  For an

employee to prevail on a retaliatory discharge claim, he must demonstrate that he or she falls

within one of the exceptions to the employment-at-will doctrine, such as termination for

whistleblowing.  Id. citing Palmer v. Brown, 242 Kan. 893, 900, 752 P.2d 685 (Kan. 1988).

    To make a prima facie case of retaliatory discharge, a party must demonstrate:  1) that a

reasonably prudent person would conclude that the employer was engaged in activities in

violation of regulations pertaining to public health, safety and general welfare; 2) that the

employee reported such a violation with a good faith concern regarding the alleged violation; 3)

that the employer had knowledge of the employee's report of the violation; and 4) the employee

19

was discharged in retaliation for making the report. Tuttle v. Eats and Treats Operations, Inc.,
No. 03-4139-RDR, 2005 WL 1799205, at *3 (D. Kan. May 23, 2005) (citing Goodman, 78 P.3d
at 821) (citation omitted)).  "A plaintiff must prove his or her claim by a preponderance of the
evidence, but the evidence must meet the 'clear and convincing' standard" in quality of proof.
Boe v. AlliedSignal Inc., 131 F. Supp.2d 1197, 1203 (D. Kan. 2001); Rebarchek v. Farmers
Coop. Elevator & Mercantile Ass'n, 13 P.3d 17, 22 (Kan.Ct.App. 2000).  A prima facie case is
not an "onerous burden" in this type of case.  Tuttle, 2005 WL 1799205, at *3 (citations omitted).

      Causation is an important part of the analysis. "[A]n employee must prove that the
discharge was 'based on' the employer's intent to retaliate, but employees are not obligated to
show retaliation was the employer's 'sole motive' for the termination." Glover v. NMC
Homecare, Inc., No. 00-3266, 2001 WL 811786, at *10 (10th Cir. July 18, 2001).  "When
evaluating whether causation has been established, Kansas courts look to whether close temporal
proximity existed between the whistleblowing activity and the discharge.  Boe, 131 F. Supp.2d at
1204.  See Rebarchek, 13 P.3d at 23.  "Proximity in time between the [report] and the firing is a
typical beginning-point, coupled with evidence of satisfactory work performance and supervisory
evaluations." Boe, 131 F. Supp.2d at 1204 (quoting Marinhagen v. Boster, Inc., 17 Kan.App.2d
532, 840 P.2d 534 (1992) (citation omitted)).  Unless the employer's adverse action "is very
closely connected in time to the protected conduct, the plaintiff will need to rely on additional
evidence beyond mere temporal proximity to establish causation." Anderson v. Coors Brewing
Co., 181 F.3d 1171, 1179 (10th Cir. 1999) (citing Conner v. Schnuck Markets, Inc., 121 F.3d
1390, 1395 (10th Cir. 1997)).

      "If the plaintiff establishes a prima facie case, the court then will apply the burden-

shifting analysis used in discrimination cases." <u>Boe</u>, 131 F. Supp.2d at 1203; <u>Glover</u>, 106 F.

Supp.2d at 1169.  The burden of production, then, shifts to the employer to demonstrate that the

employee was terminated for a legitimate nondiscriminatory reason.  <u>Tuttle</u>, 2005 WL 1799205,

at *3 (citing <u>Goodman</u>, 78 P.3d at 821).  If the employer satisfies its burden of production, the

burden shifts to the plaintiff to establish that the employer's motives were pretextual. <u>Id.</u> (citing

<u>Goodman</u>, 78 P.3d at 821; <u>Rebarchek</u>, 35 P.3d at 901).  "Specific facts disputing the employer's

alleged motive for termination must be asserted by the plaintiff to avoid summary judgment." <u>Id.</u>

(citing <u>Goodman</u>, 78 P.3d at 821).

        In their analysis of the elements of a prima facie case, defendants argue that good faith

and causation are missing from plaintiff's claim.  Defendants argue that plaintiff attempted to

achieve job security by invoking a whistleblowing claim under Kansas common law. Since their

employees were made aware of the discrimination reports only in early 2003, earlier performance

comments could not have been influenced by plaintiff's allegations.  Defendants also allude to

plaintiff's comments in a telephone conversation with Shelter agent Janice Aldag in which he

states, "[t]he only thing is, once the dialogue starts, they really can't touch me, because of the

whistle blower law...Once I blow the whistle...[t]hey've got to sit up and put up with me until

it's...through."

        The court does not find either of these arguments convincing. The ongoing concern as to

plaintiff's performance may have existed, but this does not establish that plaintiff was attempting

to gain job security by filing a whistleblower's claim. Based on the long and continuing dialogue

plaintiff had with KID and his private consultations with attorneys, the court cannot conclude

that plaintiff's complaint was in bad faith.  He sought to determine if the complaints could be

resolved internally, even though KID encouraged him to report the company.  Next, the

telephone conversation, as excerpted, is ambiguous. The uncontroverted facts are without

context, and the court is reluctant to ascribe more to these statements without a fuller

understanding of the context. Viewed in the light most favorable to plaintiff, it indicates

plaintiff's frustration with Shelter and confidence in the whistleblower protection laws.

Assuming more would be inappropriate. Thus, the court finds that plaintiff establishes the

element of good faith.

The next issue is that of causation.  Defendants provide a litany of problems with

plaintiff's underwriting as extensively documented in the prior years.  Defendants also indicate

that an internal investigation showed no evidence of discrimination of Hispanic insureds and that

a KID investigation of one of plaintiff's clients, Enrique Garcia, also showed no evidence of

discrimination.  Plaintiff responds that the best evidence of causation is the timing of plaintiff's

termination, noting the proximity of his termination to his submission of a complaint to KID.

Although plaintiff had performance issues documented over time, these issues did not

give rise to terminating plaintiff for several years.  It was only in early 2003 that plaintiff

formally notified his employer of his discrimination concerns, and only after these concerns were

voiced that the employer took action against plaintiff.  Despite e-mails expressing frustration

with plaintiff's underwriting, plaintiff was not put on probation until April 2003.  His previous

probation was in 2001 and related to his production.  While his supervisors had taken steps to

address his underwriting problems, they had not resorted to termination.

The central issue is when did plaintiff engage in a protected activity, that being reporting

alleged discriminatory practices at Shelter.  Although plaintiff alleges that he began perceiving

discrimination in mid or late 2002, he did not formally address this concern with his employers until 2003 during a conversation with Hestand.  If the February 2003 conversation triggers protection, then plaintiff's argument of a temporal connection for retaliatory discharge is weak. See, e.g., MacKenzie v. City and County of Denver, 414 F.3d 1266, 1280 (10th Cir. 2005) citing Meiners v. Univ. of Kan., 359 F.3d 1222, 1231 (10th Cir. 2004) (quotation omitted) ("A six-week period between protected activity and adverse action may be sufficient, standing alone, to show causation, but a three-month period, standing alone, is insufficient.").  The lapse in time is too long, and the evidence demonstrating temporal connection is insufficient to show causation.

If, however, plaintiff is claiming that the filing of the formal complaint in May 2003 provides the temporal proximity to satisfy causation, then plaintiff demonstrates a much stronger case that satisfies the prima facie case.  Although plaintiff made known his concerns in late February 2003, he did not file a formal complaint until May 2003.  The four-prong test states that it is the alleged retaliation after the filing of a report that triggers the temporal proximity analysis. Twenty-eight days after he filed his report, plaintiff was placed on probation.  In July 2003, plaintiff was terminated.  There is a close temporal connection between defendants' decision to place plaintiff on probation, eventually leading to his termination, and plaintiff's decision to formally notify KID of alleged discrimination.  Since the burden of demonstrating a prima facie case of retaliatory discharge is not onerous, plaintiff's temporal argument would be sufficient to satisfy this step of the analysis.

In reviewing the events, the court finds that the earlier date, the February 2003 conversation with Hestand, is the date from which the court measures temporal proximity.  This was the first time that defendants became aware that plaintiff had made reports to a state agency.

23

Based on this date, the temporal connection, standing alone, is insufficient to support causation because several months passed before defendants decided to terminate plaintiff.

Besides the temporal connection, plaintiff presents limited evidence of retaliatory discharge. Plaintiff presents no evidence in the form of e-mails or performance evaluations that demonstrate areas he may have improved. Plaintiff points to his sales award and ranking as an agent, but he has not shown that he took steps to correct administrative problems, respond to the concerns expressed by underwriting, or meet the expectations of his supervisors. He has not shown how his loss ratios compare to other agents, especially those that may have ranked below him. Although there was a close temporal connection between his second report and plaintiff's discharge, plaintiff did nothing over a period of more than a year to make any significant correction in his work. His supervisors requested to be copied on his e-mails and had to come up with a procedure to deal with his unresponsiveness. Although temporal proximity serves as a starting point for the court's analysis, there is little or no evidence of satisfactory work performance or supervisory evaluations either before or after he engaged in a protected activity. Boe, 131 F. Supp.2d at 1204 (quoting Marinhagen, 17 Kan.App.2d 532, 840 P.2d 534 (citation omitted)). During his period of probation and eventual termination, plaintiff's performance continued to be inadequate. Apart from his temporal claim, plaintiff presents little evidence and limited analysis in support of his claim. He has not established by the preponderance of evidence, with a clear and convincing quality of proof, that his employer terminated him based on protected activity. Thus, plaintiff fails to establish a prima facie case of retaliatory discharge.

In the alternative, even if the court were to find that plaintiff satisfied the requirement of a prima facie case of retaliation, plaintiff would not ultimately prevail. In the next step of the

24

analysis, the burden of production shifts to defendants, who must demonstrate that the discharge was based on legitimate, nonretaliatory basis. Defendants' review of plaintiff's employment history indicates that he had several problem areas, first in his production and then in his underwriting practices.  Underwriting employees initially expressed frustration with the volume of e-mails from plaintiff, which made it difficult for its staff to complete work for other agents. Sheryl Oncken complained that the e-mails from plaintiff's office did not have capitalization and were difficult to decipher.  Additionally, she complained the underwriting documents were incomplete, requiring her to contact plaintiff.  These ongoing and well-documented concerns existed before there was any evidence that plaintiff's supervisors' knew of a report of alleged discrimination.  The court finds that defendants have satisfied  their burden of production.

As a final step in the court's analysis, plaintiff must establish evidence of pretext.  Here, plaintiff fails to present any evidence to rebut the performance questions.  Plaintiff's response completely lacks substantive evidence of efforts to improve his work performance.  Outside of his ranking and sales award, there is no evidence in the form of evaluations or other supporting documents that provide a basis for retaining him as an employee.  There is no evidence that he responded to his supervisors' concerns.  In light of the evidence, plaintiff fails to establish pretext.

IT IS ACCORDINGLY ORDERED this 26th day of April 2006, that the court grants

defendants' Motion for Summary Judgment (Dkt. No. 64).

s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE